THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY V. B. F. WHEELBARGER.

No: 14,843   (88 Pac. 531.)

RAILROADS — *Injury at a Crossing — Contributory Negligence.* The undisputed evidence conclusively established that one who was injured at a railroad crossing was guilty of contributory negligence which precluded a recovery.

Error from Phillips district court; ABEL C. T. GEIGER, judge. Opinion filed January 5, 1907. Reversed.

*M. A. Low,* and *Paul E. Walker,* for plaintiff in error.

*E. S. Rice,* and *Mahin & Mahin,* for defendant in error.

*Per Curiam:* At a road crossing near the station of Agra, a small town in Phillips county, B. F. Wheelbarger was struck by an engine on the railroad of the

Chicago, Rock Island & Pacific Railway Company, and was injured thereby. On September 9, 1905, he recovered in the district court of that county the sum of $1700 as damages for such injuries. The railway company brings the case here for review.

It is claimed that the undisputed evidence in the case shows the plaintiff to have been guilty of contributory negligence which in law bars a recovery, and that the district court erred in not sustaining a demurrer to the evidence and directing a verdict for the defendant. This embraces the controversy presented. The evidence of the plaintiff upon this point reads:

"Ques. You drove on Railroad avenue directly west until you came to the north-and-south section road? Ans. Yes, sir.

"Q. And then you turned directly north and drove to the crossing? A. Then I turned north and drove to the crossing.

"Q. What is the distance between Railroad avenue, this road running parallel with the track, and the main track of the Rock Island? A. I should judge 200 feet —may be a little less, I could not say exactly.

"Q. After you started to drive west on Railroad avenue did you look up or down the track for any trains? A. Yes, sir.

"Q. And then after you had looked on Railroad avenue, just west of First street, you did not look again for trains or cars until you came to the crossing? A. I looked when I came in about eighty feet of the crossing.

"Q. Within eighty feet of the crossing? A. Yes, sir; my team came to a stop in a snow-drift, and I started them up and drove across the road, and after I drove the team up I looked east of the wagon to see if there was a train coming. I did n't see any or hear any, so I drove on.

"Q. Then you looked east when you were eighty feet from the crossing? A. Yes, sir.

"Q. You did not see a train when you looked east? A. No, sir.

"Q. Did you look again? A. Yes, sir; thirty or forty feet from the track I looked again.

"Q. Where did you look that time? A. Both ways —east and west.

"Q. Did you look toward the station-building? A. Yes, sir.

"Q. And past this tool-house? A. Yes, sir; I did.

"Q. Did you see a train at that time? A. No, sir.

"Q. You were forty feet from the railroad at that time? A. Between thirty and forty feet; thirty-five, as near as I can tell.

"Q. When did you first see this engine and tender? A. It was about ready to strike me.

"Q. How many feet from you? A. I could not say —six or eight. I did n't have time to get down.

"Q. It was not more than ten feet? A. I do not think it was.

"Q. Where was your team and wagon at that time? A. On the track.

"Q. Were you on the crossing at that time? A. Yes, sir.

"Q. Between the time you looked between thirty-five and forty feet from the crossing and the time you saw the engine about ten feet from you, did you look for trains? A. From that time?

"Q. Yes. A. No, sir; I did not.

"Q. Which way were you facing as you drove toward this crossing? A. I was facing the north, and a little west.

"Q. Your right-hand side was toward the station-building? A. Yes, sir.

"Q. And toward the train which afterward came? A. Yes, sir.

"Q. You have no use of your right eye? A. No, sir; not to do any particular good.

"Q. Are you totally blind in your right eye? A. I am not totally blind, but I cannot see any distance.

"Q. So that the train which finally approached came from your side on which you are not able to see? A. Yes, sir."

"Q. At what rate of speed was your team going when you drove on the crossing? A. Walk, going slow; they never trotted after I turned the corner.

"Q. That was when you were eighty feet from the crossing? Mr. Wheelbarger, at this crossing and where the north-and-south section road and railroad crosses the country is perfectly level? A. Yes, sir.

"Q. There are no buildings on either side of this crossing until you reach this tool-house, or car-house, you mentioned? A. Yes, sir; that is the first building on the south.

"Q. And between this tool-house and the beginning of this side-track switch there are no buildings on the right of way? A. No, sir.

"Q. Did you notice as you drove down this Railroad avenue that there were cars on this side-track? A. Yes, sir.

"Q. What called your attention to them? A. Looking for the cars.

"Q. How far down did they extend—to the west end of the house-track? A. I don't know how far from there. It was right close up to the derailing point.

"Q. What was the state of the weather on February 6, 1905? A. It was cloudy and snowing a little.

"Q. Was it very cold? A. Tolerably cold and disagreeable; it was not so awful cold, it was disagreeable.

"Q. About four o'clock in the afternoon this accident occurred? A. It was, as near as I can tell.

"Q. Was the team you were driving gentle? A. Yes, they were gentle.

"Q. Were you expecting a train to come along at that time? A. I expect a train every time I cross the track. There was not any train due, but I am always watching for trains.

"Q. But you were expecting a train at this time; in other words, you thought there might be one come along? A. Yes, sir; I take pains to notice for the trains.

"Q. When you first saw this engine it was about ten feet from you. Was any part of your wagon on the crossing? A. The front part was on the crossing.

"Q. That is, the front wheels of your wagon? A. About the center of the wagon, as near as I can tell."

This statement is not modified by any other testimony in the case. The general surface of the ground at this point is practically level and smooth. The railroad track is about three feet above the natural level of the land, and is straight for at least eighty rods each way from the crossing where the injury occurred. The plaintiff was a drayman, and had been engaged in business at that place for about four years. He was familiar with the grounds and other conditions, including the operation of trains on the railroad. He had a gentle team, which was completely under his control. When he was thirty-five feet from the crossing he

looked east for an approaching train and saw none. He did not look again.

According to measurements and observations made by an engineer, which are not disputed, the plaintiff when thirty-five feet from the crossing had a clear view of the track in the direction from which the engine came for 465 feet. At thirty feet from the crossing he could have seen 538 feet, and at twenty feet the track was open to view for 1083 feet. It is clear from this evidence that the plaintiff might have seen the engine in time to have prevented the injury if he had used ordinary care to do so. Under such circumstances no recovery can be had, even though the railroad company was negligent.

(*Dewald v. K. C. Ft. S. & G. Rld. Co.*, 44 Kan. 591, 24 Pac. 1101; *Roach v. St. J. & I. Rld. Co.*, 55 Kan. 654, 41 Pac. 964; *Young v. Railway Co.*, 57 Kan. 144, 45 Pac. 583; *Railway Co. v. Bussey*, 66 Kan. 735, 71 Pac. 261; *Zirkle v. Railway Co.*, 67 Kan. 77, 72 Pac. 539; *Limb v. Railroad Co.*, 73 Kan. 220, 84 Pac. 136.)

The judgment of the district court is reversed, with directions to enter judgment for the defendant.